**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| UNITED STATES *ex rel.* | ) |
|   LEONARD H. LE BLANC, III | ) |
|   JUSMAGTHAI, P.O. BOX 3521 | ) |
|   APO AP  96546-5000, | ) |
|  | ) |
|   *Qui Tam* Plaintiff, | ) |
|  | ) |
|   v. | ) |
|  | ) |
| HALLIBURTON CO. | ) |
|   5 Houston Center | ) |
|   401 McKinney Street | ) |
|   Houston, Texas 77010, | ) |
|  | ) |
| KBR, INC. | ) |
|   601 Jefferson Street | ) |
|   Houston, Texas 77002, | ) |
|  | ) |
| KELLOGG, BROWN AND ROOT SERVICES, INC. | ) |
|   4100 Clinton Drive | ) |
|   Houston, Texas 77020, | ) |
|  | ) |
| SERVICE EMPLOYEES INTERNATIONAL, INC. | ) |
|   4100 Clinton Drive | ) |
|   Houston, Texas 77020, | ) |
|  | ) |
|   and | ) |
|  | ) |
| LYNN SUMMERVILLE, | ) |
|  | ) |
|   Defendants. | ) |

**FILE UNDER SEAL**
31 USC §§ 3729 *et seq.*

Civ. no. _____

_____ )

## **COMPLAINT**

1.      This action concerns false claims and statements submitted by the largest

contractor for the U.S. Army while providing support services to the Army and other U.S. Armed Forces during the War in Iraq under the LOGCAP III Contract ("LOGCAP" or "the Contract"). Theft by certain of this contractor's managers and employees, combined with the contractor's failure to accurately report such theft to the Government, have directly and tangibly undermined the U.S. war effort in Iraq, endangered U.S. troops, and defrauded the U.S. taxpayer.

2.      Under LOGCAP, Defendants Halliburton Co. ("Halliburton"), KBR, Inc., Kellogg, Brown & Root Services, Inc. ("KBRSI"), and Service Employees International, Inc. ("SEII") (collectively, "KBR") have been required to provide a range of services, including the delivery and distribution of food and fuel for sustaining U.S. military operations; the delivery and storage of supplies and equipment; the operation and maintenance of electrical systems and equipment; and a myriad other tasks of ongoing need by U.S. soldiers stationed at some dozens of primary camps and satellite camps throughout Iraq.

3.      KBR was also required under LOGCAP to staff security services as a subsidiary service incident to their performance of their principal contractual support services, noted *infra* (such as distribution of food and fuel and delivery and storage of supplies and equipment).

4.      Further to this security service obligation, KBR staffed security personnel at base camps throughout Iraq, *i.e.*, at the camps at which they performed their principal

2

contractual support services, such as distribution of food and fuel.

5.     As explained in detail below, KBR employees stole vast quantities of U.S. Government property entrusted to KBR under contract.  In violation of the False Claims Act, KBR's managerial personnel failed to report the subject thefts to LOGCAP contracting personnel, and as personally observed by Mr. Le Blanc, certain of the Defendants' managers routinely caused inaccurate reports of stolen goods to be submitted to the Government.  KBR's scheme defrauded the U.S. Government in the midst of war by a variety of means, including, *inter alia*:

o     Through wide-ranging and ongoing theft of valuable U.S. Government property, including fuel, power generators, air conditioning equipment and other items.  As described in this Complaint, significant quantities of the subject stolen property were sold to Iraqi nationals and others.  On information and belief, some of the buyers of such property were Iraqi insurgents, hostile to U.S. soldiers and their allies.

o     By preventing the United States from ascertaining the scope of the theft problem as it unfolded.

o     By covering up or failing to report these acts of theft, which were commissioned and carried out at U.S. military bases throughout Iraq by networks made up of certain of KBR's managers, employees, Iraqi citizens and subcontractors.

o    By charging the government for stolen Government property inventory and equipment after routinely and falsely portraying the items as lost or damaged beyond repair.  If the U.S. Military was in need of these items, KBR ordered more, and then charged the U.S. Government to replace inventory.   This enhanced KBR's profits under the cost-plus LOGCAP contract.

6.    On or about March 5, 2005, KBR employed *Qui Tam* Plaintiff Leonard H. Le Blanc III (the "*Qui Tam* Plaintiff," or "Le Blanc") as a Senior Security Technician. Mr. Le Blanc continued employment with KBR until in or around December 2006.  Mr. Le Blanc reported multiple and growing findings of thievery to his supervisors, as part of his Senior Security Technician job responsibilities.  KBR willfully ignored Mr. Le Blanc's findings, and shut down his investigations.  KBR then subjected Mr. Le Blanc (and other employees who faithfully reported the stolen goods and crime rings) to hostility, undesirable job transfers, demotions and discharges.

**PARTIES**

7.    The *Qui Tam* Plaintiff, Mr. Le Blanc, is a citizen of the United States.  In accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.* (2007), *amended by* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat. 1621 (May 20, 2009),  Mr. Le Blanc brings this action on behalf of, and in the name of, the United States. *Qui Tam* Plaintiff Le Blanc is a U.S. Air Force and U.S. Navy veteran

4

(honorably discharged) and retired U.S. Naval reservist. He has over twenty (20) years of experience in security and security-related fields. He had hoped to serve with KBR for at least several years in Iraq, and was a skilled and dedicated KBR employee.

8.  Defendant Halliburton Company is a publicly-traded company incorporated in Delaware. During much of the time at issue in this Complaint, Defendant KBR, Inc. was a wholly-owned subsidiary of Halliburton. Halliburton's CEO has publicized Halliburton's work on LOGCAP in conference calls with investment analysts, referencing LOGCAP III as "our LOGCAP contract" and citing "our [Halliburton's] work" on the contract. According to a transcript of a November 29, 2005 investment analyst call, Halliburton's COO referred to the United States as "our customer" on LOGCAP III. During times pertinent to this Complaint, Halliburton has assisted KBR, Inc. in performing various corporate functions, including, without limitation: information technology and communications; human resource services such as payroll and benefit plan administration; legal; tax; accounting; office space and office support; risk management; treasury and corporate finance; and investor services, investor relations and corporate communications. Halliburton maintains a place of business at 5 Houston Center, 1401 McKinney, Houston, TX 77010 and at locations within this judicial district. Halliburton does business within this judicial district. Halliburton submitted or caused the submission of the false claims and false statements at issue and is otherwise liable for the claims asserted.

9.      Defendant KBR, Inc. is a Delaware corporation registered to do business in the State of Texas. KBR, Inc. indirectly owns KBRSI and SEII and performs services for them (such as finance and human relations services) that are directly relevant to the misconduct alleged. KBR Inc. submitted or caused the submission of the false claims and false statements at issue and is otherwise liable for the claims asserted. KBR, Inc.'s principal office is located at 601 Jefferson Street, Houston, TX 77002. KBR Inc. does business within this judicial district.

10.     Defendant Kellogg Brown and Root Services, Inc. ("KBRSI") is a Delaware corporation. Defendant KBR, Inc. is an indirect parent of KBRSI. KBRSI maintains a place of business at 4100 Clinton Drive, Houston, TX 77020, and at locations within this judicial district. It is the awardee of the government contract at issue, the LOGCAP III Contract.[1] KBRSI is a party to the Task Orders 59 and 89 of LOGCAP III at issue in this case. KBRSI submitted or caused the submission of the false claims and false statements at issue, and is otherwise liable for the claims asserted. KBRSI does business within this judicial district.

11.     Defendant Service Employees International, Inc. is a Cayman Islands

---

[1] Specifically, it is not the original awardee, but rather a successor. The legal entity that was the original awardee, and its affiliates, have experienced a variety of corporate reorganizations and transformations since the time of award, including an asbestos-related bankruptcy petition, and a well-publicized divestiture by corporate parent Halliburton Co. These contortions notwithstanding, the conduct described in this Complaint is fairly attributed to each KBR Defendant, or each KBR Defendant is otherwise liable for it, as specifically alleged.

corporation.   Defendant KBR, Inc. is an indirect parent of SEII.   The former parent company of KBR, Inc., *i.e.*, Halliburton Co., has identified SEII as a subsidiary in filings with the U.S. Securities and Exchange Commission.   On information and belief, SEII does business at 4100 Clinton Drive, Houston, Texas 77020.   When Halliburton, KBR, Inc. and KBRSI have hired contract employees for work overseas, they frequently have diverted those employees to employment by SEII.   Halliburton and KBR, Inc. treat SEII labor as "subcontract labor" for tax purposes, as reflected in their written statements to federal government auditors.   On information and belief, Mr. Le Blanc and many other employees described herein, whose work was billed to the U.S. Government, were SEII employees, at least nominally.   SEII submitted or caused the submission of the false claims and false statements at issue, and is otherwise liable for the claims asserted.

12.   The actions and omissions ascribed herein to each of the KBR Defendants are fairly attributed to all of them.

13.   During the times in question in this Complaint, Defendant Lynn Summerville ("Summerville") (KBR Badge #311344) was KBR's Power Generation and Distribution Foreman/Division Manager under LOGCAP at the installation in Baghdad, Iraq known as "Camp Prosperity."   In this capacity, Summerville had day-to-day operational managerial responsibility for KBR's provision of Power Generation and Distribution services at Camp Prosperity in Iraq.   Upon information and belief, prior to leaving the United States for his duties on behalf of KBR in Iraq, Summerville received

several days of training at KBR facilities in Houston, Texas, along with many other KBR employees.  Upon information and belief, among the documents he received from KBR during training was one entitled, "ITINERARY/INFO PACKET CANDIDATE PROCESSING FOR LOGCAP III." Upon information and belief, Mr. Summerville's Houston-based training itinerary spanned several subjects, such as "Harassment Briefing," and "Medical Follow-up." Among the training modules was a session entitled "LOGCAP III Project Briefing." Also upon information and belief, Mr. Summerville received a large training binder/manual with the title "LOGCAP III Orientation." The material in this binder explained that Halliburton/KBR Inc./KBRSI would be reimbursed by the Government for Government property ordered on the Government's behalf under the LOGCAP III Contract in Iraq.

14.     The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, is expansive in imposing liability upon multiple defendants.  For instance, it holds liable not only those who knowingly present false or fraudulent claims to U.S. Government employees, but also those who knowingly cause such claims to be presented.  *Id.* § 3729(a)(1)(A).

## JURISDICTION AND VENUE

15.     This action arises under the FCA, 31 U.S.C. § 3729 *et seq.*  Therefore, this is a case or controversy arising under the laws of the United States.  Hence there is subject matter jurisdiction under 28 U.S.C. § 1331 (2007).

16.     This action may be brought in this judicial district under 31 U.S.C. §

8

3732(a) (2007),  because, *inter alia*, at least one of the Defendants transacts business in this judicial district, and, separately, at least one of the Defendants can be found in this judicial district.

## ALLEGATIONS

### I.    The Logistics Civil Augmentation Program

17. The contract activities described in this Complaint have taken place under KBR's LOGCAP Contract.   The acronym LOGCAP stands for "Logistics Civil Augmentation Program." This U.S. Army program dates back to 1985. The U.S. Army Materiel Command, the U.S. Army Sustainment Command, and related U.S. Army and U.S. Department of Defense ("DoD") entities, have administered the program.

18.    KBR received the first contract awarded under this program, for work in Somalia, in 1992. KBR also received the third contract awarded under this program (*i.e.,* LOGCAP III), which evolved into work focused in Iraq, Kuwait and Afghanistan. This third contract is the subject of this Complaint.

19.    The LOGCAP Contract is Contract No. DAAA09-02-D-0007.   On December 14, 2001, the U.S. Army's Operations Support Command, at Rock Island, Illinois, awarded LOGCAP to Brown and Root Services, a division of Kellogg Brown and Root, Inc.  The LOGCAP Contract includes an express corporate guarantee by Kellogg Brown and Root, Inc.

20.     In or around 2003, Kellogg, Brown and Root, Inc. transferred its U.S. Government contracts to Defendant Kellogg Brown and Root Services, Inc.   On information and belief, that collective transfer included LOGCAP. KBR, Inc.'s former parent company, Halliburton, Inc., provided an additional performance guarantee.   On information and belief, KBR, Inc., has assumed responsibility for that performance guarantee.

21.     Since Operation Iraqi Freedom began in March 2003, the U.S. Army has required under LOGCAP that KBR construct, manage and maintain U.S. military camps throughout Iraq.   Part of this responsibility includes supplying fuel for U.S. military operations, as well as managing, maintaining and repairing equipment such as air conditioners, power generators, electricity systems and plumbing equipment at U.S. military camps located in the U.S.-controlled International Zone ("Green Zone") in Baghdad.

22.     Essentially, KBR provides a wide variety of services under LOGCAP in support of the U.S. Army.   KBR does this through tens of thousands of employees and through subcontractors.[2]

23.     LOGCAP was awarded as a 10-year contract, with one "base" year, and nine option years. The U.S. Army has exercised options through at least May 2009.   The

---

[2] The U.S. Army restricts the employment of Iraqis at U.S. military bases.  As a result, many LOGCAP laborers are neither American nor Iraqi. These are the Third Country Nationals ("TCN"s).

10

U.S. Army recently replaced LOGCAP III with "LOGCAP IV" and awarded portions of LOGCAP IV to companies unaffiliated with KBR.  On information and belief, this is, at least in part, because of KBR's waste, fraud and abuse under LOGCAP III.

24.    As noted above, the LOGCAP Contract was originally issued in December 2001, well before Operation Iraqi Freedom began.  The LOGCAP Contract itself provided for little if any specific work.  Rather, it established the ground rules for LOGCAP "task orders" that the U.S. Army issues to KBR.  Such task orders are awarded without competition.

25.    Task orders establish specific areas of contractor responsibility and activities.  Individual LOGCAP task orders often have exceeded $50 million.

26.    By 2004, the value of LOGCAP already was $10 billion.  In 2005, because of the LOGCAP contract, KBR was the U.S. Army's largest contractor.  In 2006, LOGCAP spending was approximately $400 million a month.  On information and belief, cumulative billing to date is over $32 billion.

27.    A substantial part of the services that *Qui Tam* Plaintiff Le Blanc provided were provided under LOGCAP Task Order 89.  Under this task order, KBR provides "theater transportation," logistics support services, base camp services, accommodations, "life support services," fuel, *etc.*, at 62 primary camps and a dozen satellite camps in Iraq. Task Order 89 was, upon information and belief, valued at $4.97 billion.

28.    Federal Acquisition Regulation (Title 48 of the Code of Federal

Regulations) ("FAR") § 52.245-5 is incorporated by reference into LOGCAP.   FAR §

52.245-5 delineates KBR's responsibilities in accounting for Government property.

29.   Section 52.245-5, in turn, incorporates by reference regulations at FAR

Subpart 45.5, which further details contractors' obligations in accounting for Government

property.   FAR § 52.245-5(e)(1) (2004) ("The Contractor shall be responsible and

accountable for all Government property provided under this contract and shall comply

with Federal Acquisition Regulation (FAR) Subpart 45.5...").

30.   FAR Subpart 45.5 establishes that in the event of "known" "loss" of

Government property, contractors are required to investigate and report such losses to the

Government.   Central to these reporting requirements is that:

> The contractor shall investigate and report to the property
> administrator all cases of loss, damage, or destruction of
> Government property in its possession or control as soon as
> the facts become known...   A report shall also be furnished
> when completed and accepted products or end items are lost,
> damaged, or destroyed while in the contractor's possession or
> control.

FAR § 45.504(b) (2005).

31.   KBR created a template set of reporting forms called, collectively, "Loss,

Damage or Destruction" ("LDD") reports, in order to comply with their LOGCAP

contractual obligations under 48 C.F.R. § 45.504(b), *inter alia*. Variously, these template

forms contained blank spaces containing labels such as "Report Type: [Lost/Damaged],"

and "Estimated Cost of Repair [or] Replacement."   KBR LOGCAP divisional

management (for each of KBR's LOGCAP divisions, such as, *inter alia*, HVAC, Plumbing, and Electrical) bore responsibility for initial preparation of such reports. Typically, such reports were then circulated to KBR's Security Division (where copies would be reviewed by personnel such as *Qui Tam* Plaintiff Le Blanc), before being forwarded up the chain of command internally within KBR, ultimately for submission to LOGCAP Government contracting personnel by KBR's "Site Manager" personnel for each Iraqi site at which KBR maintained a presence.

32.    As discussed below, KBR's management purposely submitted false and misleading LDD reports to cover up known theft of fuel, power generators, air conditioning equipment, plumbing equipment, Electrical Division tools, and other items (which theft, as described below, was in some instances undertaken by KBR's own management).  As also discussed below, KBR relatedly failed to submit LDD reports in the first instance to document Government property (such as fuel) known by KBR's management to have been stolen.

33.    LOGCAP imposed upon KBR contractual responsibilities for the Security Department into which Mr. Le Blanc was hired.  Central to these obligations were the following requirements: "...[to] investigate and report to the property administrator all cases of loss, damage, or destruction of Government property in its possession or control as soon as the facts become known..." and "Convoy Load Security. The contractor shall ensure that all loads are secured and sealed to preclude tampering and theft," and further

13

"report all [convoy] load discrepancies to government security personnel."

34.    As a related accounting requirement, KBR was required under LOGCAP to "account for costs appropriately and maintain records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles."

35.    To fulfill its contractual security responsibilities, KBR created a Security Division among their Iraqi LOGCAP workforce.  As of early 2006, the Security Division staffed on the order of 150 total employees across Iraq.  The salaries of the Security Division's employees ranged from $90,000 per year to $160,000 per year.

36.    Pursuant to LOGCAP contract clause FAR 52.216-7 (incorporated into the contract at page 36), KBRSI submits LOGCAP claims for payment "as work progresses."

37.    Page 36 of the LOGCAP Contract incorporates by reference Federal Acquisition Regulation ("FAR") 52.216-7 ("Allowable Cost and Payment").  Paragraph (a)(1) of FAR 52.216-7 mandates that the contractor "submit to an authorized representative of the Contracting Officer ... an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract."  FAR 52.216-7(a)(1).

38.  "Allowable costs" are defined  under FAR 52.216-7 as follows:

> For the purpose of reimbursing allowable costs (except as provided in paragraph (b)(2) of this clause, with respect to pension, deferred profit sharing, and employee stock ownership plan contributions), the term "costs" includes only—

14

(i)      Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(ii)     When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for—

(A) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made—

(1) In accordance with the terms and conditions of a subcontract or invoice; and

(2) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

(B) Materials issued from the Contractor's inventory and placed in the production process for use on the contract;

(C) Direct labor;

(D) Direct travel;

(E) Other direct in-house costs; and

(F) Properly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(iii)    The amount of financing payments that have been paid by cash, check, or other forms of payment to subcontractors.

FAR 52.216-7(b).

39.    Under LOGCAP, the Government "can terminate, reduce the amount of work, or replace [the LOGCACP] contract with a new competitively bid contract at any time during the term of the contract." *See* Halliburton Co. 10-Q Securities and Exchange

Commission Quarterly Report, Oct. 31, 2005, at 39 *(available at* http://www.sec.gov/).

40.     LOGCAP itself bears out this understanding on the part of Halliburton. The Contract incorporates by reference FAR 52.246-5.  That FAR provision provides that "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee... If the Contractor fails to promptly perform the services again or take the action necessary to ensure future performance in conformity with contract requirements, the Government may — ...Terminate the contract for default." *Id* (e)(2).

## II.     KBR's Performance Under LOGCAP

41.     Baghdad's "Green Zone" is located in the heart of that city, along the west bank of the Tigris River.  It covers approximately four square miles.  Iraq's central government and the U.S. Embassy are located in this area.  (The areas in Baghdad outside the Green Zone are known as the "Red Zone.")

42.     As noted above, on or about March 5, 2005, KBR employed Mr. Le Blanc as a Senior Security Technician.  He continued employment with KBR until in or around December 2006, when he was terminated by KBR in retaliation for his whistle-blowing activities, as discussed *infra*.

43.     After about three (3) weeks of training at Camp Liberty in Iraq, Mr. Le Blanc was assigned to Camp Hope, located at Sadr City, northeast of downtown

Baghdad, in April 2005.  Camp Hope closed in January 2006.  On or about February 2, 2006, Mr. Le Blanc was reassigned to Camp Prosperity D-2, located in the Green Zone, as the Security Supervisor for all KBR sites in the Green Zone.

44.    Mr. Le Blanc's job responsibilities included trying to ensure that KBR activities at these camps were secure from theft, fraud, and misappropriation.  Mr. Le Blanc's immediate supervisor was Jessie Rich ("Rich"), Security Manager for all Iraqi sites denominated as D, F, and I sites.

45.    Mr. Le Blanc personally investigated many different means by which KBR managers, employees, and subcontractors stole supplies and equipment that were U.S. Government property.  Stolen items included fuel, air conditioners, plumbing supplies, electrical goods, power generators and other expensive items.  KBR charged the cost of these stolen goods to the U.S. Government under LOGCAP.  Upon information and belief, the costs of replacement goods for the stolen goods also were charged to the U.S. Government.  In many cases, KBR's theft caused hardship to the U.S. military.

46.    Thefts identified by Mr. Le Blanc took place within at least eight separate KBR LOGCAP divisions (each set up by KBR to carry out LOGCAP contractual responsibilities), including Billeting, Power Generation and Distribution ("Power Gen"), High-Volume  Air-Conditioning  ("HVAC"),  Electrical,  Plumbing,  and  Dining Facilities/Food Services.  Mr. Le Blanc submitted all of his investigative findings to his immediate supervisors at KBR while still employed by KBR.

17

47.     The fraud and theft, individually and collectively, noted in this Complaint often involved collaboration between KBR employees and local networks and gangs, which disseminated the stolen property outside the Green Zone.

48.     On information and belief, KBR's widespread false and fraudulent conduct alleged in this Complaint preceded Mr. Le Blanc's period of service in Iraq; it continued while Mr. Le Blanc served in Iraq; it has continued during LOGCAP performance in Iraq after Mr. Le Blanc left; and, absent action by the Court, it will continue during the pendency of this action.

**A.  Theft of Government Property**

49.     LOGCAP is a services contract, not a supply contract.  It permits KBR to bill for labor.  LOGCAP authorizes KBR to purchase supplies, and bill them to the Government, only when the supplies are incidental to the performance of contract services.  All supplies that KBR purchases or produces under LOGCAP are Government property.

1. Power Generation Equipment Theft

a.    Camp Prosperity

50.     As set forth under Statements of Work issued pursuant to LOGCAP, among the services that the Government contracted with KBR to provide under LOGCAP was Power Generation and Distribution.   Specifically, the Government required KBR to "provide, operate and maintain power for all camp facilities as directed by the

18

A[dministrative] C[ontracting] O[fficer], and monitor equipment for proper load and phase balancing."

51.    Further to their LOGCAP duties, KBR set up Power Gen facilities ("shops") at U.S. Army camps throughout Iraq. KBR provided Power Generation and Distribution services from these shops.

52.    In early February 2006, Mr. Le Blanc began gathering detailed evidence of criminal activity, including large-scale theft, taking place in KBR's Power Gen Division at Camp Prosperity in Baghdad, Iraq. Additionally, as discussed separately below in other sections of this Complaint, Mr. Le Blanc uncovered evidence of widespread theft in KBR's HVAC, Electrical, and Plumbing divisions at Camp Prosperity.

53.    KBR employees at KBR's Power Gen shop at Camp Prosperity engaged in massive theft and misappropriation of Government property in 2004, 2005, and early 2006. They stole entire electrical generators, took them out of the Green Zone, and sold them. Iraqi Power Gen Division Manager Ahmed Naji ("Naji"), Foreman of all Iraqi national Power Gen workers, approached Mr. LeBlanc in early February 2006 (in the first few days Mr. LeBlanc was assigned to Camp Prosperity/D-2) and complained about widespread theft in the Power Gen Division. Naji was employed by IPBD Ltd. ("IPBD"), which was a KBR LOGCAP subcontractor that supplied labor and manpower to KBR under LOGCAP.

54.    Central to the criminal activity at Power Gen among KBR's managers and

employees were Defendant Summerville; Technician Troy Williams (KBR Badge #318727) ("Williams"); Assistant Division Head Fergus "Red" Johnson ("Johnson"), Philip (last name unknown), IPBD employee Leath Shea ("Shea"), IPBD employee Tony Ame Noail ("Noail"), along with IPBD employee Reayth Jameel ("Jameel"). Mr. Le Blanc's investigation revealed that these employees stole dozens of generator sets.

55.     Based on interviews with witnesses, including many of the above-noted participants in the theft, Mr. Le Blanc determined that the Power Generation and Distribution Division thefts occurred throughout 2004 and 2005 and through January and February 2006.

56.     Naji detailed to Mr. Le Blanc many occasions on which Summerville scheduled U.S. Army generators for routine maintenance, deliberately caused minor damage to the generators, used the new damage as an excuse to take the generators off-line, and then replaced the generators with new generators billed to the U.S Government. The "damaged" generators were then stored in a scrap area. They disappeared from KBR property records. These fraudulently "damaged" generators were then stripped of all removable parts and taken out of the Green Zone. They were sold in an Iraqi market, or to pre-arranged customers on the black market. Remaining generator shells that could not be further stripped were loaded by crane onto flatbed trucks and hauled out of the Green Zone.

57.     Another Power Gen employee confirmed that Summerville, on the basis of

20

any small problem, sought and received U.S. Army permission to remove generators from their service locations, and relocate them to KBR facilities, supposedly for repair. Summerville then told the U.S. Army that such generator units were "no good," even when simple servicing like changing air filters and fuel filters would have solved the problem. Summerville removed these generator units to the scrap yard or scrap area, and hid them. Frequently, Summerville and his cohorts broke generators down into smaller pieces and transported them out of the Green Zone. Other generators simply disappeared, unaccounted for. KBR simply ordered replacement generators at Government expense.

58.     According to IPBD Power Gen Division employee Ahmed Chasib Luaaby ("Luaaby"), in one instance, Summerville declared ten small generator sets intended for use for lighting at various Green Zone gates as "unserviceable" after he had them deliberately disabled and identified small, minor problems with each. These so-called problems did not in any way actually render the ten generator sets unfit for their intended use. Summerville had these generator sets moved to the scrap yard.

59.     Summerville's designation of such generator sets as "unserviceable" thereby benefited KBR. FAR 45.504(a) ("Contractor's liability"); FAR 45.503(a)(5)(iii) ("Relief from responsibility").

60.     Summerville assigned a KBR staffer with a DOD badge to escort Shea, Noail and Jameel, as they transported such stolen items out of the Green Zone. Numerous other items of U.S. Government property in KBR's possession, including

21

equipment and materials taken from KBR Electrical and Plumbing divisions, were stolen by similar means. For instance, electrical cables were taken to the Electrical Shop and cut down to a portable size, using the yellow table saw. Shea or Williams then carried the cables out of the Green Zone, in vehicles. These stolen electrical cables were U.S. Government property.

61.     In or around early February 2006, Luaaby provided Mr. Le Blanc with detailed accounts of two specific incidents of substantial theft. In the first, Summerville ordered 10 generators removed from the "scrap" area, repaired, and loaded on a flatbed truck. Per Summerville's instructions, these generators then were delivered to various areas of Baghdad, and sold for $30,000 to $50,000 each. Shea, Noail, and Jameel drove the truck holding the generators to the checkpoint at a bridge out of the Green Zone. Phillip escorted them.

62.     At least four (4) of these generators ended up in Sadr City, an insurgent stronghold. Once there, the generators required fuel and parts to generate power. As discussed *infra* at paragraph 129, almost every other day, Williams sold generator fuel and parts to Iraqi national KBR employees, to keep the generators in operation. This fuel and these parts were U.S. Government property, paid for by the U.S. Government under LOGCAP.

63.     The sale of generators, fuel, parts and power generated by the generators produced revenue that Summerville shared with Shea, Noail, and Jameel.

64.     Naji and Luaaby detailed to Mr. Le Blanc a second specific incident, involving two large portable military floodlights (known as "light-alls") at Checkpoint 12. Summerville and his henchmen removed them for "servicing," ordered replacements under LOGCAP, and sold the "serviced" floodlights for $10,000 each in a Baghdad "souk" (Arabic for "market").

65.     According to Naji and other witnesses with whom Mr. Le Blanc spoke, Power Gen staff also falsified purchase requests to replace supposedly "damaged and unserviceable" starter motors from a local supplier, and supposedly "unserviceable" plumbing pumps (also including skid pumps and macerator pumps). These "unserviceable" items were sold for a profit outside the Green Zone.

66.     Naji told Mr. Le Blanc that he (Naji) asked Summerville why the generators and parts were being taken out of the Green Zone. Summerville said it was for "repairs," which wasn't true. When Naji asked on several occasions why the stolen generators were not being repaired in the shop, Summerville told Naji that it was none of his business. Summerville and Shea both told Naji to "forget" about generators and parts.

67.     At one point, a certain part was needed to keep a U.S. Military generator running. Naji told Mr. Le Blanc that he recalled that the part had been taken out of the generator previously, then taken to an Iraqi market and sold. When Naji asked Summerville about this, Summerville advised Naji "to compromise (*i.e.*, forget about) [his] remembrance."

23

68.     Sometime in 2004 or 2005, Luaaby reported the theft and fraud endemic to the Power Gen operation to KBR supervisors he identified as Russ (last name unknown), Patrick (last name unknown), and Conrad (last name unknown).  He found that these supervisors would take no action against Summerville because Summerville was a close friend of KBR's Remo Butler.  Butler was KBR's LOGCAP Deputy General Program Manager and Project Manager for Iraq/Kuwait.  This was a senior position in which Butler bore managerial responsibility for much of KBR's operations in Iraq under LOGCAP.  Upon information and belief, Butler joined KBR in September 2003, and his managerial duties encompassed the activities of 18,000+ KBR employees in Iraq under LOGCAP.

69.     Upon information and belief, Summerville was recruited to KBR by Butler.  Through investigation, Mr. Le Blanc learned information that indicated that Butler agreed to protect Summerville by dealing with any person who complained about or investigated Summerville in one of three fashions:  1) transferring the individual into another KBR division or military camp; 2) threatening that individual with termination; 3) actually terminating the individual.  Butler is one of KBR's most senior managers.

70.     Aside from Naji, several other employees who worked in Power Gen refused to participate in the fraud/theft scheme directed by Summerville.  These individuals were suspended or fired, on trumped-up charges.  Specifically, according to Naji, Summerville arranged for Power Gen workers Emil (last name unknown), Patrick

24

(last name unknown), Conrad (last name unknown) and an employee who hailed from the Philippines (first name and last name unknown), *inter alia*, to be fired prior to Mr. Le Blanc's arrival at Camp Prosperity/D-2 because they refused to participate in the subject thefts. One suspended Power Gen worker offered to Mr. Le Blanc to share detailed times, dates, places, inventory numbers and other matters related to the theft ring, in exchange for being rehired.

71.    Ironically, Summerville, in speaking with Luaaby, blamed the local Iraqi staff for the thefts. The local Iraqi staff was paid in calendar year 2005 approximately $15 - $18 a day. When the subject of a pay increase came up, Summerville opposed it, because (he said) the staff was engaging in widespread theft of equipment and supplies.

72.    Mr. Le Blanc learned through his investigation that Summerville and Shea sold the power generators, equipment, and spare parts in the Red Zone to Iraqi nationals, receiving payments in return.

73.    These funds permitted Summerville to live ostentatiously. At one point, according to Luaaby as related to Mr. Le Blanc, Power Gen Mechanic Manuel Canino (KBR Badge #334471) ("Canino") complained to Summerville about Canino's $100-a-month cell phone bill. Summerville laughed and told Canino that Summerville was spending $3,000 a month on cell phone calls.

74.    In or around March 2006, a KBR employee named Samuel Simpson ("Simpson") became Power Gen Division Manager at Camp Prosperity/D-2.

Summerville and Shea asked Simpson for permission to bring three generators into the shop (intending to disable them, move them out of the Green Zone, reactivate them, and sell or deploy them for their own use). Simpson refused to authorize this. The theft of generators came to a temporary stand-still.

75.     Summerville then attempted to undermine Simpson, at the expense of the U.S. Military. For example, in or around March 2006, Summerville sabotaged generators at Tower 3 in the Green Zone in Baghdad, which such generators had been purchased by KBR under LOGCAP. Mr. Le Blanc's investigation concluded that Summerville sabotaged the generators in order that they could be transported into the scrap yard, stripped for parts, and then sold, for personal profit.

76.     An additional finding of Mr. Le Blanc's investigation was that Summerville and Williams addressed situations in 2004 and 2005 where they found a generator part or parts too large to move outside the Green Zone. In such instances, an individual named Phillip/Philip/Felipe (last name unknown) (believed to be a KBR employee stationed at the KBR Fuel Point[3] just outside Camp Union III in Baghdad, Iraq, would be contacted and he would transport such parts out of the Green Zone over the 14th of July Bridge.

77.     Mr. Le Blanc additionally determined that Summerville had established

_____

[3] As discussed *infra*, LOGCAP required KBR to operate and maintain "retail fuel points," or storage sites with adequate, readily available quantities of fuel.

and operated his own private black market utility company in Baghdad. On one representative occasion in 2004 or 2005, seven generator sets were taken out the gate at one time and ended up in the Al-Shala Area of North Baghdad for use by private Iraqi citizens. Summerville then sold electricity to those citizens for his own personal profit. If anything broke down, Summerville provided fuel, parts, oil, and other items to service the generators. When Summerville's customers in the Red Zone needed a generator set or specific spare parts, they placed an "order" and the needed items were stolen from among LOGCAP-purchased generator parts.

78.     Luaaby stated that on one occasion in 2004 or 2005, Williams persuaded another individual (upon information and belief, Jameel) to order a DOID generator set and spare parts for Sadr City, ostensibly to meet a LOGCAP contractual need for such property. Jameel bought the generator set for $10,000, a DOID-type, 750KVA. Jameel told Shea that the generator set was to be purchased by some unnamed operator in the Red Zone and Jameel was the go-between. In reality, the purchaser of the generator set was actually Jameel himself. If purchased on the open market, the cost for a like DOID generator unit would have been $30,000.

79.     Also in 2004 or 2005, a Power Gen laborer and IPBD employee named Ali (upon information and belief, Ali Moshinali) went to the KBR Security Division and filed a complaint concerning the rampant theft in the Power Gen Division, but no one addressed the complaint.

27

80.   During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the above instances of Power Gen Division property theft from Camp prosperity accurately, if at all, to Government LOGCAP contracting personnel.

b.   Camp Honor

81.      Pursuant to LOGCAP, KBR also maintained PowerGen operations at a separate site in Baghdad called Camp Honor.  At Camp Honor, Summerville, Williams, Johnson, Phillip, Shea, Noail, and Jameel stole many whole generator sets, including fifty sets (green or gray), once belonging to the pre-war Iraqi Government, which were seized by the U.S. Army and turned over to KBR for safe-keeping.

82.   Summerville led a group of workers in stealing dozens of generator sets at Camp Honor shortly after the camp closed in or around December 2005.  The United States had title to all such generator sets.

83.   During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the above instances of Power Generation Division property theft from Camp Honor accurately, if at all, to Government LOGCAP contracting personnel.

c.   Troy Williams' Theft Scheme (Camp Prosperity)

84.   Naji Luaaby and Security Technician R.C. Calligan (KBR Badge # 362827) ("Calligan") stated to Mr. Le Blanc that Troy Williams, a Power Gen employee, ran his own personal theft scheme.  The father of Williams' Iraqi girlfriend induced Williams to deliver U.S. Government property -- alternators and other parts, such as starter motors –

to him (the father).

85.    Williams did so.  According to Naji and Calligan, over an extended period of time spanning, upon information and belief, 2004 and 2005, Williams stole an extensive amount of U.S. Government property in KBR's possession, and turned it over to his girlfriend's father, who sold it.  Williams and the father split the proceeds.

86.    According to Naji and Calligan, Williams started to steal property that had been earmarked for theft by Summerville.    Summerville learned of Williams' "freelancing" and punished him for it.  He was informed of a particular time when Williams would be visiting his girlfriend.  Summerville enlisted the assistance of the Iraqi Police.  Calligan and KBR Senior Security Technician Tim Knisely ("Knisely") joined Iraqi Police on an excursion at the girlfriend's apartment building to arrest Williams in February 2006.  Meanwhile, outside, Knisely secured Williams' KBR-provided vehicle. The vehicle was full of stolen U.S. Government property.

87.    The Iraqi Police released Williams into KBR Security custody, without charging him.  KBR then fired him – not for repeated theft of U.S. Government property, but for visiting an area that was off-limits to KBR personnel.

88.    During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the immediately above noted instances of theft accurately, if at all, to Government LOGCAP contracting personnel.

2.  HVAC Division Theft at Camp Prosperity

89.    The pervasive theft with respect to Power Generation equipment was mirrored in KBR's performance of LOGCAP High-Volume Air-Conditioning duties. KBR employees were involved in the theft and misappropriation of air conditioning units, spare parts, equipment, freon gas and other materials (all of which belonged to the U.S. government) from all the U.S. military camps in the Green Zone, and the involvement of such employees was known to KBR's managerial personnel.

90.    Mr. Le Blanc separately received information from an individual named Ali Abraham Mohamad Al-Rubaee ("Ali Abraham"), an office manager in the Green Zone for a KBR LOGCAP subcontractor/contract labor broker company called IPBD. Ali Abraham contacted Basam Al Atar ("Al Atar"), a KBR employee suspected by U.S. Air Force Police of HVAC theft, and arranged for Al Atar to meet with Mr. Le Blanc.

91.    As related to Mr. Le Blanc by Al Atar, the two principal employees involved in theft of HVAC equipment during 2004 and 2005 were KBR Camp Prosperity HVAC shop Division Manager Russell Hill ("Hill"), KBR Badge #319486, and KBR HVAC repair technician Michael Peters ("Peters"), KBR Badge #363635.    These employees stole massive quantities of Government property, including air conditioning units, air conditioning spare parts, and air conditioning testing equipment.    KBR employees and subcontractors who also participated in the thefts included two Iraqi local nationals ("LNs"), Safaa Abd-Wahab Saeed Al-Nuamee ("Safaa"), MNF-I Badge#1102054, and Raad Eslawa Ajo ("Ajo"), a Plumbing Division employee.

a.    Division Manager Hill's involvement

92.    In December 2005 or January 2006, a U.S. Defense Department employee, Joseph Saladino ("Saladino"), reported to Mr. Le Blanc that he had observed and photographed a KBR employee, who he later identified as KBR Manager Hill, and KBR Iraqi LN employees unloading several air conditioning units from a KBR truck. He then witnessed them put the stolen units into two Iraqi taxis. The taxis immediately exited the Green Zone with their Iraqi occupants and the air conditioners. Saladino was able to take pictures of the two taxis driving away.

93.    On or about March 3, 2006, during a meeting with Mr. Le Blanc, Saladino positively identified Hill as the driver of the truck carrying the stolen air conditioning units in the KBR truck noted *supra*. Saladino described to Mr. Le Blanc Trevor Hill's actions in parking, exiting the vehicle, helping to unload the truck, and exiting the scene. Saladino identified Hill in a photograph he had selected. Saladino initialed Hill's photo.

94.    Saladino had previously identified Hill as the driver during a photo lineup with U.S. Air Force Office of Special Investigations investigators. Air Force investigators also obtained Statement of Repair forms ("SORs") for the air conditioning units signed by Hill around the time of incident, and they identified the two taxi drivers as KBR HVAC employees Al Atar and Rasheed Achmend ("Rasheed"). Al Atar and Rasheed admitted to the Air Force investigators that they drove the two taxis in question, containing the subject air conditioners, which the taxi drivers admitted they believed to

31

be stolen.

95.    The KBR truck noted at paragraphs 92 and 93 above was identified by Mr.
Le Blanc as being issued to Hill.  In a written statement, Hill confirmed that both he and
KBR HVAC employee Jack Callison ("Callison") possessed keys to the truck.

b.    Mr. Le Blanc's Investigation of HVAC Division Thefts

96.    Mr. Le Blanc conducted interviews with employees at IPBD (the
subcontractor/contract labor broker company) office to investigate HVAC Division thefts
at Camp Prosperity.  Ajo was identified during these interviews by IPBD staff as "the
ringleader" of the widespread theft ring in the Green Zone, including theft and
misappropriation of items from HVAC, Power Gen, Plumbing and the U.S. Army "off-
load" areas.  Ajo also transported stolen items out of the Green Zone.

97.    Mr. Le Blanc's investigation further indicated that throughout 2004 and
2005, Safaa acted as a key contact between KBR HVAC personnel and the local Iraqi
criminal gangs and took part in numerous illegal activities including theft and
misappropriation of LOGCAP materials and equipment that were transported outside the
Green Zone and sold.

98.    With the assistance of KBR personnel, Safaa illegally obtained a U.S.
Army ID badge.  This badge allowed Safaa to escort local Iraqis and others throughout
the Green Zone.

99.    After learning that Mr. Le Blanc wanted to interview Safaa, Hill told

Safaa to "disappear." Hill then told Mr. Le Blanc that he hadn't seen Safaa for the past four days. However, other witnesses saw Safaa in the Green Zone on several occasions at this time. IPBD then discharged Safaa for failure to appear at work and not explaining why he was absent. Mr. Le Blanc requested an All Points Bulletin ("APB") from the U.S. Army for a "Pick Up and Detain" Order for Mr. Safaa.

100.      In or around February 2006, the U.S. military took Safaa into custody and interrogated him about the theft ring and terrorist-related activities. Ajo was also taken into custody for the same reasons. When the U.S. military arrested Safaa, he was handcuffed and hooded at a Green Zone gate. Peters convinced the U.S. military to release Safaa into his custody after discussing Safaa's arrest and deeming it was a "KBR issue."

101.      During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the immediately above noted instances of HVAC Division property theft accurately, if at all, to Government LOGCAP contracting personnel.

3.   Thefts from KBR's Plumbing Division at Camp Prosperity, Baghdad, Iraq

102.      As noted, among the KBR LOGCAP divisions that KBR maintained in Iraq in performance of its LOGCAP duties was the Plumbing Division.[4]

103.      Unreported theft of Government property ravaged the Plumbing Division at Camp Prosperity, just as with the HVAC Division. Over several months leading up to

February 2006, KBR Plumbing Division Head Nicholas Heckman ("Heckman"), KBR Badge #322514, and his staff purposely created Lost Damaged or Destroyed ("LDDs") reports so incomplete and/or vague that useful information concerning the actual nature of thefts described therein could not be gleaned from the reports themselves. Such faulty LDDs enabled and hid widespread thefts of materials, equipment and supplies in the Plumbing Division.

104.   As reported to Mr. Le Blanc by Knisely, Heckman had no explanation for his division's inadequate LDD reporting to the KBR Security Department at Camp Prosperity over the many months immediately preceding Mr. Le Blanc's arrival at Camp Prosperity (February 2, 2006), during which time Heckman was the Plumbing Division Head.

105.   Heckman also willfully ignored and failed to implement basic security practices to safeguard Government property in his division.

106.   Office doors and Connex boxes (large metal cargo containers) in the Plumbing and Electrical divisions were routinely left unlocked and otherwise unsecured under Heckman's watch, leaving expensive equipment, supplies and materials vulnerable to theft.

107.   While Security Technician Mr. Le Blanc was doing coordinated walking inspections of the Camp Prosperity Connex storage box area, Mr. Le Blanc discovered

---

[4] LOGCAP required KBR to "provide, install, operate and maintain potable and non-

four unsecured storage boxes on or around February 11, 2006.  No Plumbing Division personnel were in the area to keep an eye on the unlocked storage boxes.  The boxes contained valuable water heaters and brand new water pumps.

108.    Also on or around February 11, 2006, Mr. Le Blanc approached Heckman in the Camp Prosperity parking lot to discuss the unsecured storage boxes.  Clearly agitated, Heckman said that he "didn't care" whether Iraqis stole property.

109.    Mr. Le Blanc explained to Heckman that KBR ran a very long supply chain and that these lost or stolen items were not easily replaced and very expensive in a war zone.  Mr. Le Blanc reminded Heckman that full cooperation and support was needed to ensure security and the unaccounted loss of inventory.  Heckman again replied that he did not care.

110.    In late February 2006, Plumbing Division Head (Acting) Robert J. Brown ("Brown"), KBR Badge #319528, took over leadership of the Plumbing Division from Heckman.  Brown reported to Mr. Le Blanc that electrical supplies and equipment had been discovered locked in a Plumbing Division Connex at the D-2/Camp on the previous day.  It was a mystery to Brown as to why Electrical Division equipment had been stored in a Plumbing Division Connex.

111.    Several KBR Electrical Division IPBD employees identified Ajo (*see supra* at para. 91), as the ringleader of ongoing theft at the Plumbing Division during

potable water systems, to include plumbing…to facilitate the operation of facilities…"

35

interviews with Mr. Le Blanc on or about February 28, 2006, in the Offices of IPBD at Camp Prosperity.  Ajo also participated in theft and misappropriation of items from HVAC, Power Gen, and the U.S. Army "off-load" areas.

112.    On or about the morning of February 28, 2006, Ajo apprised several Plumbing Division LNs that he stole everything from the locked Connex box, according to LN plumber Naoh Thamer Abood ("Abood").

113.    Ajo also stole all plumbing supply inventory stored in a U.S. Army Connex box transferred from Camp Graywolf to Camp Prosperity a year earlier, Abood said.  Only Ajo and Heckman had a key to get inside that transferred Connex box.  Ajo had a key because Heckman gave him one.  Ajo stole the Connex box and everything inside, Abood said.

114.    During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the immediately above noted instances of Plumbing Division property theft accurately, if at all, to Government LOGCAP contracting personnel.

### 4. Thefts from KBR's Electrical Division at Camp Prosperity

115.    KBR was required to supply electrical services under LOGCAP.[5]

116.    As of February 2006, hundreds of medium and large major circuit breaker switches were stored in unlocked Connex boxes.

---

[5] *Inter alia*, pursuant to LOGCAP Statement of Work: "The contractor shall provide or replace, operate and maintain electrical systems and equipment…"

117.     Robert Brown told Mr. Le Blanc during interviews that he discovered that such electrical supplies were stored in the Plumbing Division Connex box some time on the afternoon of February 25, 2006.   After Brown investigated, none of his staff or workers could explain who had placed Electrical Division materials in the Plumbing Division Connex box.   Brown padlocked the Connex and departed the area.   When Brown opened the padlocked Connex the next morning, the electrical materials were missing.

118.     Electrical Division Head Donald Walker ("Walker") KBR Badge #282594, stated to Mr. Le Blanc in or around mid-February 2006 that he was unable to secure his Connex storage boxes at Camp Prosperity.   On information and belief, locks were available at the time to Mr. Walker with assistance from the Camp Manager or the Security Department and through reimbursable purchase from a local store or at the Camp Hope PX (Post Exchange).

119.     The Electrical Division eventually placed locks on its Connex boxes, but only in mid-March 2006, after repeated and continuous reminders from February 2006 through mid-March 2006.

120.     During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the immediately above noted instances of Electrical Division property theft accurately, if at all, to Government LOGCAP contracting personnel.

5. Siphoning of Government Fuel in Baghdad, Iraq

121.    LOGCAP required KBR to operate and maintain "retail fuel points," or storage sites with adequate, readily available quantities of fuel.  Per the terms of the LOGCAP contract, this fuel was Government property and was only for distribution and use in support of LOGCAP.

122.    As detailed below, massive quantities of Government fuel were stolen from KBR's possession at the KBR Fueling Point immediately outside Camp Union III in the Green Zone in Baghdad, Iraq ("Camp Union Fuel Point") in late 2005 and early 2006. KBR's Camp Prosperity camp management was aware that the subject fuel was stolen. KBR failed to report the stolen fuel to the Government.

123.    At the Camp Union Fuel Point, KBR employees distributed Government fuel to who ever needed it, without questions asked.  Additionally, Government fuel was routinely stolen from KBR's possession to service Government generators also stolen from KBR's possession.  KBR was aware of these thefts, as reflected in KBR's fuel records.

124.    In late February 2006, Mr. Le Blanc investigated the massive fuel thefts. By studying the fuel records maintained by KBR's management, he found that fuel was routinely being pumped beyond the normal usage for the reported miles/distances driven by KBR and U.S. military vehicles.  For example, the records examined by Mr. Le Blanc reflected that even if certain of the vehicles noted in the fuel records had driven for 24

hours per day for one full month, the subject vehicles could not have consumed all the fuel allocated to such vehicles in KBR's fuel records during the month in question.

125.   Mr. Le Blanc performed this investigation by reviewing daily fuel records for specific vehicles that had been gassed up over the month for January 2006.

126.   In examining KBR's fuel records, Mr. Le Blanc also compared recorded tallies of vehicle fuel withdrawals against mileage driven.  In one instance, Mr. Le Blanc noted that a man identified in KBR's fuel records as "Douglas Moore" purportedly -- according to the KBR records -- drove eight kilometers on *1640 liters* of fuel in January 2006.[6]  The actual Douglas Moore, whom Mr. Le Blanc was later able to interview, was on leave at the time that Mr. Le Blanc discovered the 1,640 liter fuel entry (among others detailed in the fuel logs).  Upon speaking with Mr. Moore, Mr. Le Blanc discovered that Moore was horrified that someone had, apparently, used his (Moore's) name to effectuate a non-authorized fuel withdrawal in part via fictitious use of Moore's name.  Moore apprised Mr. Le Blanc that he (Moore) had nothing to do with the above-noted withdrawal of 1,640 liters of fuel.

_____

[6] As Mr. Le Blanc was personally aware, the KBR Defendants were not assigned any tanker trucks in performance of their LOGCAP duties in or around Baghdad (thus negating the possibility that the fuel log entry noted immediately above could be attributable to or associated with the authorized fueling of a tanker truck vehicle – perhaps the only type of automotive vehicle that could conceivably consume a volume of fuel remotely approaching the volume – as compared to purported, associated mileage driven - noted in the fuel log reviewed by Mr. Le Blanc).

127.    Mr. Le Blanc discovered similarly fictitious fuel usage entries purporting to justify large fuel withdrawals.  For example, Mr. LeBlanc determined that KBR Fuel Point personnel had given ten (10) "temporary" fuel usage cards to unknown persons for fuel withdrawals.  The cards were numbered from "90" through "99," and no information was recorded on the fueling card, nor in Fuel Point records, concerning who received or used the cards.

128.    One KBR Camp Union Fuel Point worker suspected of massive thefts was dismissed by KBR on or about February 22, 2006.

129.    Pursuant to the scheme cited at paragraph 62 *supra*, KBR LN workers maintained four stolen generators in the Sadr City district of Baghdad.  As reflected by the Camp Union Fuel Point fuel records that Mr. Le Blanc examined, these workers ran the generators with fuel siphoned from the Camp Union Fuel Point by Williams.

130.    Summerville provided fuel for stolen generator sets used by private Iraqis throughout Baghdad. Summerville regularly obtained fuel for these generators and collected payments from users of the generators.

131.    During his investigation, Mr. Le Blanc determined that KBR failed to document many fuel transactions.  This lack of documentation was, upon information and belief, intended to cover up massive theft of Government fuel.

132.    During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the immediately above noted instances of fuel theft accurately, if at all, to Government LOGCAP contracting personnel.

6.    Failure to Report Known Loss of Government Security Badges

133.    Thousands of Iraqi political figures, their staff, U.S. government employees, civilian service workers, delivery workers, and residents enter the Green Zone each day.  They carry various sorts of identification badges, which grant different access privileges.  Some badges allow their holders to come and go through the Green Zone without being searched.  For security reasons, official policy requires meticulous background checks of individuals before badges are issued to them.  The outer rings of security checks in the Green Zone are run by guards working under contract with the U.S. military.  KBR Site D2 at Camp Prosperity ("D2") and KBR Site D14 at Camp Hope ("D14"), along with at least a dozen other sites, are located within the Green Zone.  As discussed below, KBR corrupted the procedure for obtaining identification badges in ways that enabled and rewarded theft and fraud.

134.    In or around early March 2006, Mr. Le Blanc became aware that KBR's employees had, over the course of several weeks, improperly distributed military security badges to individuals without conducting standard vetting and background checks on the subject individuals.  These badges granted security privileges for entry and access to areas of camp that non-holders of such badges could not access.  Thus, the improper

41

badge issuances endangered lives in the Green Zone and enabled ongoing theft operations.

135.    Mr. Le Blanc's investigation of KBR's improper issuance of military badges to unauthorized persons indicated that HVAC Division employee Michael Peters (noted *supra*), Electrical Division employee Noe Morin ("Morin") (Badge #335405), Labor Department employee Michael Jackson ("Jackson") (Badge #329634), former Power Gen Division employee Fergus Johnson ("Johnson") (Badge # unknown), and HVAC Division employee Richard Kolivoski ("Kolivoski") (Badge #318058), all fraudulently obtained at least eight security clearance badges in order to sell them to unauthorized persons.

136.    On or about January 15, 2006, according to records in the US Army's Mayor's Cell Office at Camp Prosperity/D-2 (as examined by Mr. Le Blanc), Peters, Morin, Jackson, Johnson and Kolivoski falsified data in badge applications submitted to the military for the purpose of permitting two local Iraqi workers access to the Camp Prosperity D2 dining facility ("DFAC"). .

137.    On or about February 11, 2006, Peters made a spontaneous and voluntary statement to Mr. Le Blanc about his active role in illegally arranging to get a U.S. Army "Yellow" Escort Badge for Safaa (noted above) through the Camp Mayor and U.S. Army Badging Office at Camp Union III in exchange for three tanks of helium. (The Army used helium to fill intelligence and observation balloons.)

138.    Holding this badge allowed Safaa to freely escort local Iraqis into the Green Zone.   Peters also said that this was done through an Army staff sergeant ("SSGT") Balisi (first name unknown) at the Camp Union III Pass & Identification/Badging Office, Baghdad, Iraq and a Staff Seargent Morris (first name unknown), U.S. Army Camp Union III Mayor.   On information and belief, Safaa wore this badge routinely.

139.    Ultimately, as discussed further below, as a result of Mr. Le Blanc's investigation of KBR's knowledge of lost military badges, KBR management requested that documents reflecting loss of Government security badges be shredded to keep LOGCAP contracting officers from learning of the losses.

140.    During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the above-noted instances of badge theft accurately, if at all, to Government LOGCAP contracting personnel.

7.   <u>KBR Intervention to Prevent Mr. Le Blanc from Alerting Government Personnel to the Massive Losses in Government Property</u>

a.    <u>Security badges</u>

141.    When Mr. Le Blanc shared copies of all pertinent security badge documents reflecting the results of his investigation with his immediate supervisor, Security Coordinator Kenneth Anderson ("Anderson") (Badge #332842), Anderson instructed Mr. Le Blanc to "shred all the documents" on or about March 7, 2006.   Mr. Le Blanc explained that a security breach in issuing badges had taken place.   He reminded

43

Anderson of the Mosul DFAC bombing.  Anderson again told Mr. Le Blanc to "toss out" or "trash" the documents.  Anderson then waved his hand and said "get rid of the documents and we (will) not discuss the matter again."  Anderson then departed the area. Mr. Le Blanc did not shred the documents.

      b.   <u>HVAC</u>

142.    KBR's Human Resources Department repeatedly interfered with investigations of theft and misappropriation of Government property.  For example, KBR Senior HR staffperson Patricia Murphy ("Murphy"), Badge #315626, personally protected suspects of investigations in the KBR HVAC Division at Camp Prosperity.

143.    In or around late February 2006, when Mr. Le Blanc and Knisely were discussing with Murphy their notes from a meeting with Peters and Hill about their involvement in and knowledge of HVAC Division thefts, Murphy accused them of falsely recalling the event.  Murphy then stressed what a fine job Hill and Peters were doing with HVAC and again accused Mr. Le Blanc of trying to defame and slander them. At the time, hundreds of HVAC air conditioning units, components and spare parts were missing and unaccounted for from the HVAC Division.

144.    Murphy warned Mr. Le Blanc not to talk with anyone about Hill and several other members of the HVAC Division.  At no time did Murphy ask Mr. Le Blanc for details about Mr. Le Blanc's HVAC-related investigations.

      c.   <u>Electrical</u>

145.    KBR managers treated Mr. Le Blanc's investigation of missing electrical supplies and equipment with hostility.  On or about February 28, 2006, Mr. Le Blanc was interviewing KBR Electrical Division LN workers at the Camp Prosperity IPBD Offices when Mattie Van Exel ("Van Exel"), KBR Electrician, KBR Badge #287664, barged into the office and demanded to sit in on the investigation.  IPBD's two co-General Managers, a Mr. Ali and a Mr. Khalid, were in attendance and IPBD had requested that Mr. Le Blanc interview the IPBD workers.

146.    Van Exel began shouting that Mr. Le Blanc had no business interviewing her electricians and no right to fire workers.  Van Exel continued by berating Ali, Khalid and Mr. Le Blanc in a loud tone of voice saying she would not tolerate *her* workers being questioned and in fear that their rights and hers were being violated.  Mr. Ali, Mr. Khalid and Mr. Le Blanc explained that all the electricians were IPBD employees and did not "belong" to Van Exel.  Van Exel became more belligerent and shouted that "G-d will punish you all!" (Ali, Khalid, and Mr. Le Blanc) and stormed out of the door.

147.    After interviewing the first IPBD electrical worker, KBR Electrical Foreman Ronald Battle ("Battle"), Badge #299156, entered the office.  Battle began loudly questioning Mr. Ali as to why Mr. Le Blanc had to interview these IPBD Company electricians.  Both Ali and Khalid explained that it was part of a sanctioned KBR Security investigation approved through the Camp Manager and the IPBD Company.  Battle turned to Mr. Khalid and started shouting to him: "Shut your f---ing

45

mouth!"  Each time Khalid tried to speak, Battle screamed again and again, "I am not talking to you!"

        d.   All theft reporting and investigations

148.    Mr. Le Blanc went on leave on March 15, 2006.  When Mr. Le Blanc returned to Iraq on April 2, 2006, he learned that his supervisor, Jessie Rich, had been fired and then re-instated on appeal.  When Rich returned to work, he found himself hamstrung on investigations of massive theft of property.  No investigation could be performed without approval from the highest levels of the security command.  Rich soon quit KBR in disgust.

        8.   Known, Unreported Loss and Theft of Government Property in Other Areas of Iraq

149.    KBR employee Michael "Mike" Melcher ("Melcher"), a KBR buyer in KBR's LOGCAP Procurement, Supply & Materials Division, along with his colleagues, investigated the disappearance of large and costly Government property inventories from KBR's custody in Iraq from late April 2004 to June 2006.

150.    Melcher apprised Mr. Le Blanc (who by that time was tasked as a "buyer trainee") that he (Melcher) and other buyers of inventory for KBR's ongoing contractual obligations in Iraq repeatedly ordered and re-ordered the same property items in large quantities. Curious about why the inventories were disappearing without reason, they started tracking high-volume, costly items from their overseas or local shipping sources to the destination points in Iraq where inventory was stored and distributed.  Melcher

stated to Mr. Le Blanc that he and his colleagues had quickly determined that inventories had disappeared, including whole container loads of air conditioning units, generator spare parts; copper wire, plumbing supplies, large generator sets that would have to be moved with large cranes, forklifts, and flatbed trucks. Government property disappeared in Mosul, Tikrit, Camp Victory, and other KBR C-sites and B-sites.

151.    According to Melcher, as a routine practice, in 2004, 2005, and 2006, when KBR buyers inquired about the missing inventory, they were told by their supervisors in their respective divisions that the issue was none of their concern.  Between April 2006 and June 2006, Melcher regularly updated Mr. Le Blanc on what appeared to be massive misappropriations and thefts throughout the whole of Iraq at all KBR sites until Mr. Le Blanc left the department in late June 2006.  Mr. Melcher continued to update Mr. Le Blanc on the ongoing nature of the thefts periodically through December 2006.

152.    In on or around September 2006, two senior KBR managerial employees, one a project manager and the second a deputy project manager, were discharged in Mosul, Iraq after whole container loads of Government property vanished -- including containers storing 500 rear vehicles axle assemblies.

153.    During his entire time in Iraq, Mr. Le Blanc saw no evidence that KBR reported any of the above-noted instances of Government property disappearance accurately, if at all, to Government LOGCAP contracting personnel.

**B.   <u>Kickback Schemes Involving KBR Power Gen Personnel</u>**

154.   According to Luaaby as related to Mr. Le Blanc, during 2005 and 2006, Shea extorted money from every Local National (*i.e.*, Iraqi) worker's salary within the Camp Prosperity Power Gen Division by demanding and receiving kickbacks.   For example, if a local Iraqi worker had a daily pay rate of $11, Shea forced the worker to kick back $2 to Shea each day under threat of termination.   Iraqi IPBD workers who complained about this kickback system were forced to quit their jobs.

155.   Upon information and belief, KBR billed the full amount of the Iraqi workers' salary, and overhead, *etc.*, to the U.S. Government, including the amount of the kickbacks, with knowledge that Shea had extorted $2 per salary per day.

**C.   Double Billing**

156.   Mr. Le Blanc also learned through investigation that KBR was double-billing the Government for HVAC repair services.

157.   According to Peters, even though KBR's HVAC Division was fully capable of fixing any air conditioning problem of any size in 2004 and 2005, Peters stated that he and Hill, on behalf of KBR, steered substantial KBR work to Safaa in his capacity as an independent contractor.   The cost of this independent subcontract work was then billed to the Government.   To do his independent subcontract work, Safaa transported air conditioning units to his work shop outside the Green Zone at the Al Qadesiyah Apartment Complex ("215 Apartments"), a crowded, 10,000-resident apartment complex just east of Camp Union III.   The repair of air conditioning units or other parts off-base

was strictly prohibited.

## III.   <u>Retaliation</u>

158.   In April 2006, Mr. Le Blanc was unceremoniously removed from his KBR Security position without any explanation. He was transferred to a "buyer trainee" KBR position in Procurement in Iraq, with a lower salary. On or about April 16, 2006, Anderson apprised Le Blanc, with less than 24 hours notice, that Le Blanc was being transferred to KBR Iraqi Site F-2. Mr. Le Blanc received nothing in writing about the transfer or new buyer trainee position. No explanation was offered as to why Mr. Le Blanc was being transferred. Once transferred, Le Blanc had few work responsibilities or direction.

159.   According to Jene Harper, KBR's Area HR Department Head, and Dave Ford ("Ford") with KBR's Employee Relations Program, Mr. Le Blanc's personnel file recorded slanderous and defamatory information about Mr. Le Blanc that had been surreptitiously compiled without his knowledge. Such portrayals were untrue and produced in retaliation to Mr. Le Blanc's investigations of theft and criminal behavior at KBR. Mr. Le Blanc was previously aware of only praise for his professionalism and work ethic. Mr. Le Blanc never received any written or verbal counseling, admonitions, reprimands or negative comments about his performance by anyone in his Security chain-of-command. Ford refused Mr. Le Blanc permission to review his personnel file or allow Mr. Le Blanc an opportunity to respond to the accusations contained in the file.

160.     On information and belief, all Security staff were told by KBR Security manager Sandy Darden in or around late April 2006 not to allow Mr. Le Blanc access to security offices.

161.     On or about April 27, 2006, Jene Harper, the Area HR Department Head, told Mr. Le Blanc that KBR Security HQ had come to Harper and asked that Mr. Le Blanc be fired immediately.  Harper said that he had subverted Security HQ's wish that Mr. Le Blanc be outright discharged by arranging to have him transferred to the KBR Procurement, Supply & Materials Department as a "Buyer-in-Training" effective April 27, 2006.

162.     While Mr. Le Blanc worked as a Buyer, he remained "assigned" to the Security Division as Senior Security Technician.  Mr. Le Blanc delivered his weekly timesheets, R&R requests and other compensation documents to Security supervisor Chuck Baldwin ("Baldwin") for approval.[7]   Baldwin flatly refused to process or to approve Mr. Le Blanc's paperwork.  Baldwin, instead, referred Mr. Le Blanc to KBR Security manager Sandy Darden.  Darden refused to sign or approve anything Mr. Le Blanc brought to him without extensive and unnecessary explanation.

163.     Darden eventually told Mr. Le Blanc in early May 2006 the reason Mr. Le Blanc was transferred from job to job was because Mr. Le Blanc had been investigating theft by KBR employees.  Mr. Le Blanc explained that he had simply been

---

[7] Baldwin came to occupy this position subsequent to replacing Rich in that capacity.

following the LOGCAP III HQ Security Investigations Manual issued on or around September 2005. That manual had not been amended or rescinded to Mr. Le Blanc's knowledge. Mr. Le Blanc meticulously followed those instructions to best of his ability.

164.     At no time during his investigations of widespread theft had any of Mr. Le Blanc's KBR managers or supervisors accused him of wrongdoing or irresponsible behavior. Among others, his direct supervisor, Jessie Rich, was fully informed and periodically apprised of the progress and nature of Mr. Le Blanc's investigation activities while Mr. Le Blanc served as Security Technician.

165.     Mr. Le Blanc then stated to Darden that Darden was participating in a massive cover-up of theft and left Darden's office. Darden quickly issued orders to all KBR Security staff members that Mr. Le Blanc was not permitted to enter any KBR Security office under any circumstances.

166.     In or around late June 2006, Mr. Le Blanc was transferred to serve as a foreman supervising housecleaners in the Labor Department at Camp Victory North, at a substantial reduction in salary.

167.     During spring, summer, and fall of 2006, Mr. Le Blanc applied for several new security positions with KBR and dozens of non-security positions with KBR. Mr. Le Blanc applied for announced openings of Security coordinator inside the D, F & I Sites and also three more openings involving the U.S. Embassy in Baghdad and related consulates. Security Coordinator positions were also available in other locations,

including Djibouti, Africa and Afghanistan. These positions were the lowest level Security manager jobs available, providing for supervision of small staffs numbering as few as two. Mr. Le Blanc applied for every security job available for which he was qualified. KBR did not respond, but filled the jobs with other candidates less qualified than Mr. Le Blanc.

168. In early October 2006, Mr. Le Blanc's application for a position as Assistant Sub-Contracts Manager at Camp Taji was accepted. In December 2006, he was terminated by KBR, on false pretenses. On the day of his termination, Mr. Le Blanc stated to KBR's HR Department Manager that he was being terminated because of his whistle-blowing activities. The Department Manager did not deny this assessment.

## IV. Additional LOGCAP Billing Facts

169. KBRSI submitted LOGCAP bills, including those at issue in this Complaint, to officers and employees of the United States Government for payment or approval. KBRSI received payments from the Government for these bills.

170. LOGCAP is a cost-reimbursable (specifically, Cost-Plus-Award-Fee "CPAF") contract. LOGCAP contains both a 1% base fee provision, set forth at Section H36 of the contract (a fixed profit percentage applied to actual costs to complete the work), and an award fee provision (a variable profit percentage applied to "definitized" costs, which is subject to the U.S. Government's discretion and tied to the specific performance measures defined in the contract), also set forth at Section H36 of the

contract. Base fee revenue is recorded at the time services are performed, based upon actual project costs incurred (including labor), and includes reimbursement for general, administrative, and overhead costs. Per Section H36 of the LOGCAP contract, an award fee is granted periodically by the U.S. Government based on an evaluation of KBR's performance under the LOGCAP contract as evaluated by a LOGCAP Award Fee Evaluation Board (AFEB).

171.    More specifically, the Federal Acquisition Regulation ("FAR") identifies a cost reimbursement contract as one providing "for payment of allowable incurred costs, to the extent prescribed in the contract." FAR 16.301-1.

172.    A CPAF contract pays the contractor not only allowable incurred costs permitted by the contract (as any cost reimbursement contract does), but also "a fee consisting of (a) a base amount . . . , and (b) an award amount, based on a judgmental evaluation by the Government." FAR 16.305; *see also* FAR 16.405-2.

173.    A CPAF contract, unlike a cost-plus-incentive-fee ("CPIF") contract, generally calculates the fee in relation to total allowable costs actually incurred under the contract, not target costs. Thus in a CPAF contract like LOGCAP, there is no direct penalty for cost overruns (although the Government may consider cost-effectiveness when determining the award amount).

174.    The payment of an award fee, consisting of a base amount plus an award amount, is reflected in the LOGCAP Contract, for instance at Contract Line Item Number ("CLIN") 0009, on Page 7 of the LOGCAP Contract.

175.    Section H.36 of the LOGCAP Contract provides for a maximum award fee of 3%. The LOGCAP base fee is 1% of allowable cost. The "earned" award fee is up to 2% of cost, based on KBR's award fee score, as determined by AFEB. The AFEB evaluates KBR's performance under LOGCAP as "Excellent," "Very Good," "Good," or "Average," in deciding on an award fee to be tendered to KBR, pursuant to procedures set forth at Pages 11-17 of Attachment 002 of the contract. As set forth at pages 11 and 12, under LOGCAP, the contractor's receipt of an award fee is contingent on the contractor's receipt of a performance rating of "Good," "Very Good," or "Excellent."

176.    As described at page 11 of attachment 2 to the contract, in order to receive its award fee, the LOGCAP contractor must submit to the Government a "written assessment describing its performance" under the contract.

177.    In 2006 alone, KBR received $120 million in LOGCAP award fees.

178.    The U.S. Army has awarded KBR most, although not all, of LOGCAP's 2% "earned" award fee. Both the base fee and the "earned" award fee are calculated on the basis of KBR's incurred costs.

179.    The only constraint on this phenomenon – that KBR profits from LOGCAP waste, fraud and abuse – is when KBR gets caught. Getting caught can lead

54

to: the disallowance of costs submitted as allowable costs in LOGCAP claims; a reduction in the percentage of the "earned" award fee; a reduction in the fixed base fee; a reduction in the costs found to be allowable under the contract; and the treble damages and penalties recoverable in this action, *inter alia*. These remedial actions can occur, however, only when KBR gets caught.

180.    Since DoD pays KBR for its LOGCAP work for all costs that KBR claims as allowable under the terms of the LOGCAP contract, KBR has no incentive to minimize its costs of performing its LOGCAP contracting duties.

181.    Since the task orders are awarded without competition, the normal constraint that competition imposes on waste, fraud and abuse has been eliminated.

182.    KBR submits "cost or pricing data" with its task order proposals, to help DoD judge cost realism and reasonableness in the pricing of these task orders.

183.    As a result, KBR does not even try to economize on LOGCAP expenditures. On the contrary, as outlined above, KBR consciously endeavors to waste money because higher costs result directly in higher base and award fees.

184.    As enumerated above at, without limitation, paragraphs, 8, 9, and 11, SEII, Halliburton, and KBR, Inc. caused KBRSI to submit payment claims to the Government beginning in early 2004, throughout the term of Mr. Le Blanc's employment, and during the KBR Defendants' LOGCAP performance in Iraq after

December 2006 through the date of filing of this Complaint, to replace the government property noted above, known to Defendant to have been lost, damaged, or destroyed.

185.     Page 1 of the LOGCAP contract provides that payments under the contract will be made by the Defense Finance & Accounting Service ("DFAS"), Rock Island Operating Location, Building 68, Rock Island, Illinois 61299.  KBRSI —and any other Defendant with knowledge of this information, are thereby aware that KBRSI's LOGCAP claims will be presented to DFAS — at that location.  On information and belief, Halliburton, SEII, and KBR, Inc. were aware of this information.  Upon information and belief, during the pertinent time period, DFAS further processed KBRSI's LOGCAP claims in: Indianapolis, Indiana; Kansas City, Missouri; Cleveland or Columbus, Ohio; and/or Denver, Colorado, *inter alia*.

### First Claim –FALSE CLAIMS (FCA § 3729(a)(1)(A))

186.     All of the preceding allegations are incorporated herein.

187.     KBRSI has billed the United States Government under that contract each month, and will continue to do so throughout the pendency of this lawsuit.  Each of these claims, beginning in or around January 2004 and continuing throughout the pendency of this lawsuit, is a false or fraudulent claim, for the reasons alleged above.  For instance, with each request for payment, KBRSI either implicitly or explicitly certified that it was complying with the terms of the LOGCAP III contract's provisions, including, without limitation, the contract's property loss reporting obligations, when in fact it was not, and

KBRSI knew that it was not complying with such provisions.  On information and belief, all of these false claims were presented for payment or approval to employees of the United States Government.

188.    KBRSI submitted these claims with the knowledge and intention that such claims would be presented to officers and employees of the United States Government for payment or approval.  KBRSI did so with actual knowledge of the falsity of each claim, reckless disregard for the truth and falsity of each claim, or deliberate indifference to the truth or falsity of each claim.

189.    Halliburton, KBR, Inc. and SEII knowingly caused such false and fraudulent claims to be submitted, for the reasons alleged above.

190.    The KBR Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

### Second Claim – FALSE STATEMENTS (FCA § 3729(a)(1)(B))

191.    All of the preceding allegations are incorporated herein.

192.    The Defendants knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims paid or approved by the United States Government, and will continue to do so throughout the pendency of this lawsuit.  As to the KBR Defendants, examples of such false records and statements include the purposely incomplete LDD Plumbing Division statements noted at paragraph

103, and the fuel records maintained by KBR management noted at paragraphs 124 and 125 of this Complaint.  As to Defendant Summerville, examples include each statement noted at paragraph 57 of this Complaint that generators known to be functional were not in fact functional.

### Third Claim – CONSPIRACY (FCA § 3729(a)(1)(C))

193.     All of the preceding allegations are incorporated herein.

194.     As alleged, KBR Inc., KBRSI, SEII and Halliburton, through Remo Butler, acted in agreement and in concert with Summerville to submit claims for the purchase of property to replace Government property known to have been stolen and diverted to non-Government use.  KBR Inc., KBRSI, SEII and Halliburton, also through Butler, further acted in agreement and in concert with Summerville to submit false statements to the Government, with the intention of thereby receiving payments from the Government on false LOGCAP claims.

195.     The Defendants, between and among themselves, having possession, custody, or control of property used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal such property, agreed to deliver, and caused to be delivered, less property than the amount for which they received a certificate or receipt, and have thereby conspired to defraud the Government in violation of 31 U.S.C. § 3729(a)(1)(D), damaging the United States.

196.    The Defendants, between and among themselves, have further conspired to defraud the Government by obtaining or seeking to obtain payment of Defendant KBRSI's false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A), thereby damaging the United States.

## Fourth Claim –FCA § 3729(a)(1(D) VIOLATIONS

197.    All of the preceding allegations are incorporated herein.

198.    As alleged, Defendant Summerville had possession, custody, or control of property used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal such property, delivered, or caused to be delivered, less property than the amount for which he received a certificate or receipt.

199.    As alleged, the KBR Defendants had possession, custody, or control of property used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal such property, delivered, or caused to be delivered, less than all of that property.

## Fifth Claim - REVERSE FALSE CLAIMS (FCA § 3729(a)(1)(G))

200.    All of the preceding allegations are incorporated herein.

201.    As alleged above, KBR employees – oftentimes including KBR managerial personnel -- systemically diverted large quantities of Government property.  As also alleged, KBR management was aware of such thefts.

202.    KBR management, in spite of its awareness of these losses, failed to promptly report the losses to the Government.

203.    By failing to report and otherwise omitting from their LOGCAP claim submissions known cases of loss, damage, or destruction of Government property in their possession or control as soon as the facts become known, and by falsely and expressly and/or impliedly certifying compliance with FAR § 45.504(b) in their claim submissions, the KBR Defendants knowingly made, used, or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G)).

204.    As alleged, the KBR Defendants further knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

**WHEREFORE**, for each of these claims, the *Qui Tam* Plaintiff requests the following relief from each of the Defendants, jointly and severally:

A.    Three times the amount of damages that the Government sustains because of the acts of the Defendant;

B.    A civil penalty of $11,000 for each violation;

C.    An award to the *Qui Tam* Plaintiff for collecting the civil penalties and damages;

D.    Award of an amount for reasonable expenses necessarily incurred;

E.   Award of the *Qui Tam* Plaintiff's reasonable attorneys' fees and costs;

F.   Interest; and

G.   Such further relief as the Court deems just.

### Sixth Claim – RETALIATION (FCA § 3730(h))

205.   All of the preceding allegations are incorporated herein.

206.   For the reasons alleged above, the *Qui Tam* Plaintiff was an employee who was discharged, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of his employment by his employer because of lawful acts by Mr. Le Blanc in furtherance of efforts to stop one or more violations of Subchapter III of Chapter 37 of Title 31 of the United States Code. This included Mr. Le Blanc's investigation in furtherance of the instant action after being transferred by KBR to the position of Buyer.

**WHEREFORE**, for this claim, the *Qui Tam* Plaintiff requests the following relief from each of the KBR Defendants, jointly and severally:

A.   All relief necessary to make the *Qui Tam* Plaintiff whole;

B.   An order providing for reinstatement with the same seniority status that the *Qui Tam* Plaintiff would have had but for the discrimination, or in the alternative, front pay;

C.   Two times the amount of back pay and front pay;

D.      Interest on the back pay and front pay;

E.      Compensation for special damages sustained as a result of the discrimination, including but not limited to litigation costs and reasonable attorneys fees;

F.      Pre-judgment and post-judgment interest;

G.      Punitive damages; and

H.      Such further relief as the Court deems just.

## JURY REQUEST

The *Qui Tam* Plaintiff requests a jury for all issues that may be tried by a jury.

Respectfully submitted,

Victor A. Kubli (MD012917)
W. Clifton Holmes (495186)
KUBLI & ASSOCIATES, P.C.
9081 Shady Grove Court
Gaithersburg, Maryland 20874
Telephone (301) 801-2330
Telephone (703) 749-0000
Facsimile (703) 442-8672

Attorneys for *Qui Tam* Plaintiff
Leonard H. Le Blanc III

June 17, 2009